Bentley, J.
The plaintiff in error was tried with one Negley I). Cochran upon an indictment charging them with the publication in-the Toledo Commercial newspaper of September 6, 1889, of at false and malicious libel upon certain five persons constituting the Board of Gas Trustees of the city of Toledo, appointed! under the act of January 22, 1889; it being alleged in the indictment that said libel was published of and concerning said-five persons, and each of them, and of them as such trustees..
On the trial the jury acquitted said Cochran, but found said Boyle guilty as charged in the indictment, and his motion for a new trial being denied, he was sentenced to pay a fine and costs, and to suffer a certain term of imprisonment.
A bill of exceptions, embodying all the evidence and rulings of the court on the trial, was duly allowed and made a part of the record, and the same is attached to the petition in error filed by P. C. Boyle in this court, for the purpose of obtaining a reversal of said sentence and the setting aside of the verdict.
Prior to the entering of this plea of not guilty to said indictment, the defendants demurred to the indictment, on the-ground-that-the facts stated therein did not charge them with any offense under the statute of this state. The demurrer was ' overruled, and the defendants excepted. And the plaintiff in error, Boyle, alleges error in the overruling of said demurrer. His counsel urges -thi’ee grounds of demurrer :
1. That the charge in said indictment is'double ; that it charges a libel on the gas trustees as individuals, and also-libel on the public board which they officially constituted.
2. That there is no sufficient colloquium alleging that there-had been any actual transactions of the trustees, or any handling or dealing with the public funds by them, regarding which the alleged libel charged them with misconduct.
3. That the article as published was not in fact or law libelous, since it showed merely such a criticism of the action. *166 ■ of public officers in the discharge of their public duties as would be privileged under the law. ,
We were furnished with a stenographic report of the opinion of the learned judge of the court of common pleas in overruling the demurrer. It treats the questions involved at length ; and, without discussing the matter at large, we are -content to say that we are satisfied of the correctness of the •conclusions reached.
The other errors assigned in the petition in error regard the rulings of the court; the admission of certain evidence offered by the rejection of evidence offered by the defendant below; the overruling of the motion for a new trial, based in part on 'the alleged insufficiency of the evidence to sustain the verdict ; the charge of the court, and its refusal to charge as requested.
Very few of the exceptions taken on the trial to the action •of the court — the. admission or rejection of evidence — were pointed out or referred to by counsel; they preferring, doubtless, to treat questions which they regarded as more serious. But we have gone through the entire record, and find about forty exceptions under this head, A large number of these exceptions were entered on the court’s overruling the objections of defendant’s counsel to evidence of Boyle’s connection with the Toledo Commercial after September 6, 1889. Some ■of this evidence regards admissions of Boyle made about De■eember 18, 1889, and later, and some of it regarded acts done by him at various times after September 6, 1889, and indeed down to within a few months of the trial, and which ad■missions and acts tended to show that Mr. Boyle was, at the various times subsequent to September 6, 1889, to which the evidence related, the responsible head of the Toledo Commercial. The court of common pleas admitted this evidence, and .refused to rule it out on the ground that some testimony had been given tending to show that in July, 1890, Mr. Boyle had been .elected president of the Toledo Commercial Co., the owner cand publisher of the paper, and was from that time connected *167 with its management, and that as there was no suggestion of any change, and no evidence tending to show any change in bis relations to the paper up to the time to which the latest challenged testimony related, this evidence was admissible in further corroboration of the testimony as to his status on September 6, 1889, and in order more clearly to define and show the part he took in the practical management and control of the paper. In the holdings in this regard, we think the court of common pleas did not err, although it must be confessed that some of the evidence regarding the later acts or admissions of the plaintiff in error was rather remote, and in allowing it the court approached the confines of its discretion in such cases; especially is this the case where the testimony regarded conversations of the plaintiff in error long subsequent to the publication of the alleged libel, and where the conversations contained very little that might be regarded as admissions of the plaintiff in error, and very much of certain Other circumstances which possibly might have been used on the trial to his disadvantage; But we cannot say that in any of those instances there was error in the rulings of the court. I will go rapidly through some of those objections to the evidence, •disposing of them more or less hurriedly, as it is necessary to do.
The exception on page 54 regards the board's expression, or the expression of the members of the board of gas trustees, as to the value of the gas right in the Skinner tract of land, to which the alleged libel mainly related. The testimony was that the members of the board, standing upon the land while considering its purchase, made expressions of their belief that the price which was asked and which they finally agreed to pay, was a reasonable price. In view of the rule of law regarding the competency of testimony upon the trial, «pon the part of the trustees, showing or tending to show •their actual honesty in the transaction, we think this testimony was competent, and that its admission was not? error.
The objections on pages 50 and 60 of the record relate to *168 testimony by which it was sought by -the trustees' to show their motives in holding secret sessions of the board, mentioned in the alleged libel; that is, it was proposed by them to show that instead of their motives being improper or wrongful, they were such as lawfully they might entertain,, and that the secret sessions thus held were not indications of any dishonesty upon their part, but the contrary. And we-think this class of testimony was fairly and properly admissible.
On page 97 it was sought to be shown who was the city-editor or editors of the Toledo Commercial at this time, in July, or just before this time in July, when the alleged change in its management took place. We think that class-of testimony was also competent and proper to show t-he condition just before the time of the change, and at- the time thato the change in the management might have occurred, as evidence clearly pointing out such a change. At least we see no prejudice that would result in showing who the editor was-under the former administration of the paper.
' On page 126 the question objected to and allowed, was not' answered.
The objections on pages 3 35 and 336 relate to questions to a witness — one of the employes of the paper — as to the number of papers which were printed on September 6, 1889, and regarding the circulation. We are unable to see what proper-objection could be urged against a question of that kind, or against evidence which tended to sfiow that on the occasion in question a very large edition of this paper had been published' and had been put into a general circulation.
On page 156 appears an objection regarding the admission of the affidavit of the plaintiff in error, Boyle, of date May, 1880, regarding Ms tax return. But the disposition of this comes fairly under the head of the actions and admissions -of Mr. Boyle subsequent to September 6, 1889, in connection with the "testimony regarding his status before and at that time, and we think that it was properly admissible as an act *169 .-.-and admission by him at that time with reference to his -status, there being no suggestion, as we understand, of any • change in his relations to the paper after he admitted what he ■ did admit.
On page 202 objection was made to the introduction of 29 • checks, dated in September, bearing the printed signature of the 'Toledo Commercial Co.., by P. C. Boyle, president, the words and letters. “ P. C. Boyle, Prest.,” being written, as' ithe testimony tended to show, by Mr. Boyle himself. These' • checks bore various dates, all in the month of September in • question, from.September 2, perhaps, until the last days of the month:;.and for the reasons alreadv indicated, we think ■the court was abundantly justified in allowing those checks with that signature and with the statement to go to the jury.
There was an objection made-to the receipt of evidence of a -certain entry in the registér of the Hotel Madison of September 2,.in connection with-testimony, tending to show that .at that time Mr. Boyle placed his signature upon the register •of the Hotel Madison of this city. We see no objection to' the admission of that testimony.
On page .217 -there was an objection arising upon the cross- • examination of one of the State’s witnesses regarding the •contents of a deed for the Skinner tract of laud in question. The State had been permitted to prove the transaction regarding that fact largely in detail, in order to show that instead of its supporting any ground of a charge of misconduct, the ■•trustees aoted .properly and conscientiously in the matter. Now, on cross-examination the witness was asked, as I rc.member it, whether at the time that they purchased the gas right in this tract they had also engaged to purchase and .acquire the oil right in the same tract. The objection on the part of the State, as appears by the record, was that it was sought to give the contents of a written instrument — of a•deed for the right or laud in question; the court did not per.mit the question to be answered, but sustained the objection .to it. W.e .think .that .this Indicates somewhat a inisappre *170 hension of the rule to be applied in such a case. It was proper on cross-examination, when the witness had testified of his interest in this transaction and of the details of the transaction, to inquire into such of its details as the defendants’ counsel would think tended to show an improper act on the part of the witness of the trustees. Every inquiry regarding what appears in a deed is not necessarily to be excluded because it is giving, perhaps, substantially some of the contents of a written instrument. It is only in case where-the contents of a written instrument become a matter of controversy, or is to show the foundation of a title, or something of that kind, that this rule should be rigidly enforced; but upon cross-examination, to test the' motives and conduct of a-witness, we think it would have been proper to have allowed the cross-examination to proceed. Defendants offered to prove in-this connection that the trustees did in fact negotiate for the oil right as well as the gas right in this particular-land. We are unable to see, from all that appears in this-record, that permission to put that question to the witness and¡ to have it answered, would have had such a bearing upon the-case as to'have had any appreciaable influence with the jury, and we would not be willing for any error committed in that regard to disturb the verdict or the sentence. We now simply express our ideas on what would have been proper in the case-On page 230 are objections relating to the payment'of these-checks which I have mentioned. We think testimony as to their actual payment and as to the times of their payment, was not improper, for the reason, at least — and perhaps there are other reasons — that one of the employes of the Commercial had testified that it was the habit of Mr. Boyle to place-his signature to the checks of this kind in blank, and that-the-witness would from time to time, as necessity required, fill out the checks with the amount and the name of the payee, etc.,, and then they would be paid. So, as the testimony was, it left it for the jury to find that these signatures were not and should not be regarded as signatures of Mr. Boyle in Septem *171 her, or of about that time at all; they might have been placed there long before actual use in September. The testimony that they were, in fact, used for the very purpose for which the witness said they were signed, taken in connection with the other testimony, at least had the tendency to show for whatever they were worth that when they were thus negotiated and paid in September, they continued to be acts and admissions of Mr. Boyle as of that date.
On page 232 objection is made to the introduction of a portion of an alleged letter from P. C. Boyle to Gov. Campbell, dated July 3, 1890. So far as the date is concerned, if it contains any admission, of course the objection to it is disposed of by the remarks that I have already made regarding the subsequent admissions of Mr. Boyle ; but the particular objection seems to be that instead of placing the whole letter before the jury, only a mutilated paragraph was offered, containing the alleged admission. If, on inspection of this letter, we could see that other paragraphs or statements in the letter were so related to the paragraph in question that they bore upon the alleged admission contained in this paragraph, our conclusion might be different from what it now is, because of course, in fairness, when an admission of the defendant in a criminal case is given by proving any words or sentence which he has said or written, the whole that he wrote or said at the time, which bears upon the construction and the meaning of what he did say, should go to the jury together. But this paragraph thus given we think contains what might be regarded as the admission of Mr. Boyle, as of that date, and is not modified by any other paragraph or sentence in the letter; and in view of the fact, therefore, that the defendants afterward put the whole letter in evidence, and the jury had it all, -we are unable to see how it can be rightfully claimed that this was so prejudicial to the plaintiff in error that a verdict of the jury following it should be set aside or disturbed.
Page 232. — Trustee Parsons, while he was upon the stand, was permitted to answer various questions by which he de *172 nied that the “ stealing or skullduggery,” or improper con-duet charged in the libel, actually took place to his knowledge, and we think the court was abundantly justified in allowing him to thus deny the improper conduct thus charged upon him, in order to show the falsity in fact, of the statements in the alleged libel.
Now, these are all the exceptions which we find to the admission or rejection of testimony in the course of the trial.
In attempting the disposition of the assignments of error regarding the charge of the court and its refusals to charge, and the overruling of the motion for a new trial, we have encountered not a little difficulty, and have found ourselves under the necessity of carefully investigating many of the •important features of the law of libel, especially as regards newspaper publications with a view of deducting the true rules which should govern in this case. We have consulted the authorities particularly as to responsibility for ei mmunications on what is denominated occasions of privilege, or oJ qualified privilege ; as tb the extent to which a proprietor ' of a newspaper is to be held criminally liable for libelous articles appearing therein ; and as to the burden of proof in such cases, and how far the common law on this subject is in force in this state. We find that upon many of these subjects the holdings of courts and the conclusions of lawT writers have not been so uniform nor so clearly stated as to afford plain guidance in such a case as this now under consideration. Nevertheless, we are persuaded that there results from a just consideration of the authorities, certain rules upon these points, which are also in accord with the general principles laid down by our Supreme Court in other cases. We will state certain of the other conclusions to which we have arrived, and then proceed to consider the record in this case with reference to 'their application.
Whether the language of an article printed and published in a newspaper is susceptible of a libelous meaning or not is *173 a question of law for the court; whether it was in fact used in the particular case with a libelous meaning, is, at least, where the words are not so clear, direct and unambiguous as to afford no opportunity but for one construction, a question of fact for the jury.
A newspaper, or any person, may, with good motives and for justifiable ends, freely and boldly, and with severity, or ridicule, criticise aud comment upon the official conduct of public officers, and draw any deductions from those actions and the circumstances which, with any show of reason or fairness, might be claimed to follow therefrom. But where the criticism or comment is not confined to the act itself, but asperses the motives of the officer, and makes statements of fact which amount to a charge against him of an offense against the law, or of a gross infraction of good morals, the defense available to him who is' responsible for the charge, is to prove its truth.
The case first proposed being one of qualified privilege, the law will not presume malice from the mere falsity or injurious character of the criticism or deduction, but requires proof of actual malice in order to hold the critic guilty of libel; nevertheless, an injurious comment upon the official, not amounting to an actual charge of crime, may be shown by proof to have been actuated by hatred of him and actual malice or spite towards him, and the presumed privilege thus destroyed will afford no shield to the libeler. On this subject we have examined the case of Hamilton v. Eno, 81 N. Y. 115, and many other authorities. It is said in some of the books that this expression, “ occasion of qualified privilege,” is not a proper one to be used ; that there is no action where the libel is privileged, but that the true statement is, that in cases where there is a fair and proper comment without malice, upon the acts of a public officer, however severe these comments may be, it is in fact not a libel at all.
Hence, as T have said, it is manifest that in a case where the *174 alleged libelous article is fairly susceptible of either of two constructions: one which would interpret it as charging a crime, and the other as being only a vigorous'and severe denunciation of alleged blundering, negligence or inefficiency, its real character and the meaning intended must be left for the jury to determine. On the determination of this question will depend, of course, the adjudged character of the article as of qualified privilege or as unqualifiedly libelous. So it would be proper for the State, in view of this double or ambiguous aspect of the case, to assume such burden of proof as would legally fall to it in either aspect, and to prove the actual falsity of the charge, and such other facts as might show actual malice in causing the publication. This view will be seen to justify the introduction of certain evidence offered by the State and objected to by the defendants on the trial.
It was argued, or I might say, conceded, on the hearing before us, that by the rules of the common law, the proprietor of a newspaper was criminally as well as civilly liable for any libelous article appearing therein, and that he might not be permitted to show in his defense that he had no part in the insertion of the article, and had not and could not have any knowledge of its proposed insertion, it being a conclusive presumption of law that he was responsible for everything that was published in his paper. And this seems to have been the common law of England which was held and enforced until the act of parliament of 6 and 7 Vic., commonly called Lord Campbell’s act, was passed, though Chief Justice Cockbtjrn, in Regina v. Holbrook, 3 Q. B. D. 60, seemed inclined to hesitate about acknowledging it. But in the same case afterward coming up, he could no longer even suggest a doubt, however unwelcome the doctrine then seemed to him.
The act provides as follows : “ Whensoever upon the trial of an indictment or information for the publication of a libel, under the plea of not guilty, evidence shall have been given which shall establish a pi’esumptive ease of publication against the defendant, by the act, of any other person by his author *175 ity, it shall be competent to such defendant to prove that such publication was made without his authority, consent, or knowledge, and that the said publication did not arise from want of due care or caution on his part.”
Of course it is not claimed that the act of parliament is of any force here, as modifying the common law on the subject, but it is urged by counsel for plaintiff .in error that it shows a recognition of the harshness of the original rule of the common law, and a necessity for its amelioration, and that it is proper to consider this in construing our own statute defining the crime of libel. This is section 6828 Rev. Stat., and reads as follows :
“ Whoever writes, prints or publishes any false or malicious libel of or concerning another, shall be fined not more than $500, or be imprisoned not more than six months, or both; but nothing shall be deemed a libel unless there is a publication thereof.”
The contention is that this last clause — “but nothing shall be deemed a libel unless there is a publication thereof” — was inserted for the same reason that prompted the Lord Campbell act, and to accomplish the same end, and that it should be construed so as to give it the same effect. We dou'bt the correctness of this claim. There being no crimes in this State except those defined by statute, this statute alone must be looked to to define the crime of libel. The first sentence having provided that whoever prints or writes a libel is guilty, this latter clause became necessary in order to modify the very definition which, without it, by mere grammatical construction, would have rendered a person who privately wrote or printed an article guilty of libel, though there had been no publication. We are more ready to adopt this idea, in view of our conclusions regarding the common law on this subject prevailing here.
As to what extent the common law of England has been adopted in this state, our supreme court has many times expressed its views. In 1 Ohio St. 245, the court held this *176 language : “ It has been repeatedly determined by the courts of this state that they will adopt the principles of the common law as the rules of decision, so far only as those principles are adapted to our circumstances, state of society and form of government.” Also in 2 Ohio St. 391, the court, or the judge pronouncing the opinion, uses the following language : “The English common law, so far as it is reasonable in itself, suitable to the condition and business of our people, and consistent with the letter and spirit of our federal and state constitutions and statutes) has been and is followed by our courts, and may be said to constitute a part of the common law of Ohio. But whether it has been found wanting in either of these requisites, our courts have not hesitated to modify it to suit our circumstances, or, if necessary, to wholly depart from it.” Also in a case in 3 Ohio St. 178, the court says: “ But having been adopted (speaking of the common law) in the original states of the union, and introduced into Ohio at an early period, the common law has continued to be recognized as the rule of decisions in our courts, in the absence of legislative enactments, so far as its rules 'and principles appeai’ed to be based on sound reason, and applicable to our condition and circumstances. The common law, therefore, has no force in Ohio, except so far as it derives authority from judicial recognition in the practice and course of adjudication in our courts; and this extends no further than it illustrates and explains the rules of right and justice as applicable to the circumstances and institutions of the people of the State. In the case of Sergeant v. Steinberger, 2 Ohio, 305, the Supreme Court held that the common law, so far as it related to the subject of the estate by joint tenancy, would not be recognized in Ohio, upon the ground that “the jus accrescendi was not founded in principles of natural justice, nor in any reasons of policy applicable to our state of society or institutions; but on the contrary, was adverse to the understandings, habits and feelings of the people.”
Now let us see how this rule enunciated by Lords Kenyon *177 and Tenterren is regarded in the land of its adoption. Chief Justice Cockburn, in the case of Regina v. Holbrook, already referred to, says this regarding this matter — pages 63 and 64:
*“ Now, it is an undoubted principle of law in general that a man can only be made criminally responsible for an act which he has committed himself, or through the agency of another, either actually or constructively. ' And it is to be taken as a fact, as the case now stands, that the parties who were made the defendants in this criminal information were none of them actually cognizant of the publication, and it is not to be inferred, in my opinion, from the mere employment of an editor to conduct this part of the paper, however wide may be the discretion which they allowed to him in the conduct of it, that they gave him authority to do that which would be contrary to the criminal law of the land. * * * But at the same time, while that is the general proposition, there seems in practice to have been introduced an exception to the general rule in the particular case of libel, for whatever may formerly have been the rule of the law, there can be no do'ubt Lord Kenyon, at nisi prius, and afterwards Lord Tenterren, also at nisi prius, held that where the fact of proprietorship was proved, and if the libel complained of was found in the publication conducted by the agents of the proprietor, the proprietor might be held criminally responsible. It is not at all necessary on the present occasion to say how far one assents to or dissents from that legal doctrine; it is enough to say that it was afterwards considered by some of the most enlightened thinkers of the day, lawyers and non-lawyers, that we had an anomaly in the law, which violated the first principles of justice and ought to be got rid of.”
The same judge, in 4 Q. B. D., L. R., in the same case, afterwards coming up, said this:
“ It has been laid down authoritatively, at a time when perhaps less liberal views as to the liberty' of the press prevailed, that the proprietor of a public journal, though absent, *178 and wholly ignorant of matter inserted in the journal by his editor, was nevertheless responsible, not only civilly, but also criminally, if the matter so inserted were libelous, in direct contravention, I cannot but think, of the fundamental principles that to constitute guilt there must be a mens rea, an intention to violate the law.”
This conception of the rule would not seem to indicate its being in full accord with the spirit of our institutions, and with this spirit of right and justice which must be found in the common law in order to secure its recognition by the courts of the State. It is noticeable that while the act of 6 and 7 Vic. does not in terms interfere with the prima Jade presumptions that have been held to arise on proof of the proprietorship oí a newspaper, but merely provides what the defendant may show in his defense when a presumptive case is made against him, yet the Chief Justice, in his evident abhorrence of the old rule, makes the statute a sort of excuse for the overthrow of the obnoxious rule itself, since he holds that it is now incumbent on the crown to prove in the first instance some connection of the defendant with the publication of the libel other than the mere fact of his proprietorship of the paper.
We feel abundantly justified in holding as we do, that the rule of the common law as stated, was never adopted or in force in Ohio; that it is not in harmony with the spirit of our institutions, and is at war with these general principles underlying our criminal jurisprudence, which require, in order to make out such high orders of crime, the proof of some volition of a criminal mind, or of some culpable recklessness or negligence which in all fairness ought to be held its equivalent.
The objection ah ineonvenienti to this seems to us not to be valid, since direct proof of a proprietors’ participation in or responsibility for a libel is not required; but such responsibility may be often fairly inferred by the jury from proofs of conditions and circumstances which may, by the exercise of *179 reasonable acumen and assiduity, be collected and presented by the prosecutor, as the record of this very case illustrates.
These being our views as to several of the questions involved, as we think, in this case, let us examine the record to see whether, tested by them, any error of the court of common pleas intervened in its instructions, or in refusing any proper instructions to the jury.
We regard this article as the court of common pleas regarded it — as susceptible of libelous meaning. We think it might be fairly interpreted as intending to charge these gas trustees with such criminal offenses as would not admit of its being held to be a privileged communication or criticism. But we also think that a jury might give it a milder construction, as really intending to charge on those trustees merely such bungling and heedless .inattention to the interests of the city as to result in waste of public funds entrusted to their charge, and to allow other persons to accomplish frauds upon the city. It is not our province to indicate as to which, or whether either of these two possible constructions is clearly the correct one. Our duty and right stops with the determination that here are two fairly possible interpretations, one of which would require the application of rules different from those which would govern in case the other view should be adopted. The plaintiff in error requested the court to charge the jury as follows on this subject (Proposition 5):
“The article claimed to be libelous, having been published by the defendants in reference to a public board, the officers engaged in the performance of a public duty, as to matters* which came within the sphere of their jurisdiction, I say to you that this constitutes an occasion for the publication of the article which is privileged. The defendant cannot, therefore, be convicted under this indictment, unless they are proven beyond all reasonable doubt to have been instigated by actual malice against the board and its members, because the presumption of malice which arises from the publication of the *180 article is rebutted by the occasion of privilege, and therefore proof of actual malice is required.”
It would have been an error for the court to have given, this charge in the language in which it was preferred, since in effect it would have committed the court to the absolute adoption of one of these interpretations of the alleged libel, and thus to have invaded the province of the jury, as we have seen. The court refused to give this charge, and the defendants excepted. The court, however, did charge the jury as follows, speaking of the libel:
“The language it is unnecessary for me to give here in detail. It will be presented to you in the indictment. It is sufficient for me to say that another branch of this court has-passed upon the language charged to have been written and printed by the defendants of the said trustees in their official capacity, and that this language was held to be defamatory and actionable.”
To this there was no exception noted. This charge as given, as will be readily seen, does commit the court to that interpretation of the article other than that sought by the fifth request, since it instructs the jury that as it stands, the article is “libelous and actionable.” This left the jury with nothing to do but to find whether the defendants published that article, and was the only charge bearing upon the proposition involved — the interpretation or construction of the article. It forbade the jury from finding that it was a case of qualified privilege, and relieved them of considering any question of actual malice, as would have been their duty, could they have found for the forbidden construction. The old rule in the construction of a libelous article was that it should be interpreted in mitiori sensu — that is, that the eourt and jury were bound to construe the. words of the alleged- libel in the most lenient sense. This rule has now long been abrogated, of course, but such construction is to be given as would fairly comport with the general understanding of the language *181 adopted in it, considering the circumstances attending its publication.
Now, the defendants below also requested a charge upon 1 another point — their proposition No. 1:
“ Before the defendants can be convicted of the libel charged in the indictment, something more must be proven than that they were the publishers or editors of the paper in which the alleged libellous article was contained. Proof must be offered which shall satisfy you beyond a reasonable doubt that the defendants had knowledge of the said article before it was published, and authorized, participated in or consented to its publication.”
We think that under the rules which should bear upon the question now being discussed, this was stating the proposition too broadly. The language of Chief Justice Cockburn, in the case that I have mentioned, we think fairly shows the true rule upon this subject: That it is not necessary that the proprietor of a newspaper should have actual knowledge of the proposed insertion of the particular libel, or that he should be actually engaged in or connected with its insertion, or that he directly authorized, or participated in or directly consented to its publication; but his responsibility for it must be judged by considering the circumstances in which he was placed, the course of the paper at prior times regarding similar matters, the opportunities which he had of knowing of the probability of an insertion of any libellous article, with the facts regarding his attention to the paper of which he was proprietor, whether he took any pains to be advised if it was conducted fairly and properly. All of these circumstances and conditions may be considered in determining his criminal responsibility for a libel inserted in his paper which he in fact did not have a hand in inserting.
Proposition No. 3, bearing substantially on the same subject, was as follows;
“ If the testimony shall show that Mr. Boyle was only the business manager of the incorporated company which owns *182 the Oommereial, and not the proprietor, publisher or editor of said paper, nor the author of said article, nor the distributor of the paper containing the same, then he cannot be found guilty under this indictment.”
Under the same observation that I have already made regarding the first proposition, we think it is shown that this proposition could not be given in the terms in which it is-couched. But the court’s attention was called to this feature of the case by these two propositions, and, although we have found them to state the principle in terms too strong and not sufficiently guarded, yet in the charge the court did give to tne jury, there is no instruction whatever upon this point, except as we may gather from the general language, that they should take into consideration all the testimony and give it such weight as in their judgment it was entitled to.
The only other proposition which I have not as yet alluded to, which was refused by the court, was proposition No. 2, which is as follows:
“ The defendants cannot be convicted unless there has been proof which shall satisfy you beyond a reasonable doubt that the alleged libelous article had been read and understood by some one other than the defendants, before this indictment was found.”
Now, stated broadly, as applied to any case of libel, this proposition does not state the correct rule, because the proposition here is that the alleged libelous article must be read, and understood by some one other than the defendants. So it would follow that in a case where the defendants had taken a libel which they themselves had published or printed, to a public meeting or gathering, or to any place, and read it aloud so as to be understood by the people there congregated, it would not have been a publication of the libel. But, under the authorities, we think that such a transaction wmuld constitute a publication. So that it wras not strictly necessary that some one other than the defendants should read the article. But as applying to this case, where there was no proof *183 tending to show any publication of the article by reading-aloud by one of the defendants, the proposition may have been unexceptional in this regard. But from the fact that there was, as we think, ample proof from which the jury might have found a publication, the failure to give this charge would not tend sufficiently to the prejudice of the defendant,. Boyle, as to warrant our interfering with the sentence and verdict simply upon that ground.
I will speak of one other exception to the charge in this-connection; the charge was exceedingly brief, considering the magnitude of the issues involved and the difficulty in the' resolution of the questions which the jury had to consider.
In stating the quantum of the proof which must be offered, the court, in the beginning of the charge, and several times, thereafter, stated it substantially as follows: “ The defendants have pleaded not guilty to the charge made against them,, and this devolves upon the state the necessity of proving, before they can ask, or at least before they are entitled to ask of you a verdict of guilty, proof that will satisfy you, and satisfy you by a preponderance of testimony, of the truth of essential matter contained in the charge made against the defendants.” That was repeated in various portions of the charge — that is, that they were to find the defendants guilty simply if the preponderance of the testimony Avarranted them in so finding, until at last, near the close of the charge, they were further instructed that this preponderance must be so strong in fact that they could say —that it entitled them to say — that they Avere satisfied beyond a reasonable doubt of the truth of the charge. Upon that matter Ave would hardly be able to find with sufficient clearness that the jury Avould not have finally understood the quantum of. proof which it Avas necessary for them to find in order to return a verdict of guilty. It might have been better if the whole rule had been stated in connection with each paragraph of the charge upon the subject, and not left to a sentence near-the close of it; but we are to suppose that the jury Avere fairly *184 intelligent, and that they were able to hold all parts of this charge sufficiently in mind so as to apply the rules given in any portion of it to the consideration of testimony.
The motion for a new trial in this case involved the charge that the verdict was not supported by sufficient evidence. We think", under the circumstances of the case, and in view of our ■determination of the case generally, that it would not be proper for us to express an opinion one way or the other in that regard. We think that in a case of this magnitude and difficulty, where the court’s attention was called to some of the rules which should have been given for the guidance of the jury, the court ought to have given some instruction upon these points; that, although the court properly refused the requests of the defendants below as not giving the true rule to be applied by the jury, yet it was scarcely affording the defendants a fair trial of the issues when the jury were left wholly uninstructed regarding these questions. We think ■the charge should have embodied some instruction upon this matter of qualified privilege, and the necessity of actual malice in one case; an instruction that the jury were to interpret this •alleged libelous matter, and determine for themselves whether it did involve a charge of actual crime, or was fairly susceptible of the milder meaning to which I have alluded. We also think that in a case of this kind, where the proofs stood •as they did in this case, the jury should have had some instruction regarding the responsibility or liability of the proprietor or manager of a paper, in case they should fail .to find that he was the person who actually composed the libel or caused its actual insertion. And although there is no exception to the charge in the particulars in which we regard it ■ as inadequate or improper, we think that the action of the court of common pleas in denying the motion for a new trial was erroneous, and that in giving this charge that this libelous article had been held to be libelous and actionable by another branch of this court, without qualification or condition, that ■court erred.
J. A. Barber, Pros. Att’y, and J. D. Ford, for the State.
Hon. Frank H. Hurd and Hon. J. M. Bitehie, for plaintiff in error.
It is therefore, the order and judgment of this court that said court of common pleas be reversed, and said verdict be set aside, and that the case remanded to the court of common pleas for a new trial.